**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TALIM HUNT | : | |
| | : | |
| Appellant | : | No. 2295 EDA 2025 |

Appeal from the Judgment of Sentence Entered April 24, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001018-2023

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TALIM HUNT | : | |
| | : | |
| Appellant | : | No. 2296 EDA 2025 |

Appeal from the Judgment of Sentence Entered April 24, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001019-2023

BEFORE: LAZARUS, P.J., MURRAY, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY MURRAY, J.: **FILED AUGUST 13, 2026**

In these consolidated appeals, Talim Hunt (Appellant) appeals from the judgments of sentence imposed after a jury convicted him of one count each of first-degree murder and aggravated assault, and two counts each of

---

[*] Retired Senior Judge assigned to the Superior Court.

carrying a firearm without a license and possessing an instrument of crime.[1] After careful review, we affirm.

As the trial court explained, the instant cases arose "from two separate shooting incidents that involved Coty Hargett [(Mr. Hargett or the victim)]. Mr. Hargett was injured in the first shooting and died as a result of the second shooting." Trial Court Opinion, 10/29/25, at 2. The Commonwealth subsequently charged Appellant, at two separate dockets, with the above offenses. On April 21-25, 2025, the cases proceeded to a consolidated jury trial, at which Appellant maintained he acted in self-defense with respect to both shootings.

The trial court summarized the facts adduced at trial as follows:

[Philadelphia] Police Officer John McGrody ("Officer McGrody") responded to a radio call on September 20, 2022, for reported gunshots at the intersection of Sydenham Street and Ducannon Avenue in Philadelphia, … but saw no evidence of a shooting at this location. He proceeded to the area of 15th [Street] and Fisher Avenue, where he was flagged down by two men in a white van, who directed him to a shooting victim further south on 15th Street. There, the officer encountered a black male at the corner of the intersection of Ducannon, bleeding from the right shoulder, who identified himself as [Mr. Hargett]. Officer McGrody transported the victim to Einstein Hospital for treatment. When questioned, Mr. Hargett [stated he] was unsure who shot him and indicated the shooting occurred [at the location] where he was picked up. However, Officer McGrody observed no blood or shell casings in the area. N.T., 4/22/25 at 5-19; *see also* Exhibits C8; C7; D1.

Later that afternoon, Detective Ryan Moore ("Det[ective] Moore") interviewed Mr. Hargett about the shooting in the trauma

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 2702(a)(1), 6106(a)(1), 907(a).

bay at Einstein Hospital. [Mr. Hargett] told the detective he walked out of Victor's Grocer at 15th and Ducannon between 8[:00 AM and] 8:30 AM, saw a man with a gun that was going to rob him, then [Mr. Hargett] ran and got shot. Detective Moore retrieved video surveillance footage from the location, [which showed] Mr. Hargett riding a bicycle in front of the store, heading westbound towards 16th Street. The video later depicted him returning to the area 20 minutes later, appearing to be shot. Detective Moore confirmed that the information provided by Mr. Hargett was false and unsupported by any video or ballistic evidence at the store location. N.T., 4/22/25, at 19-37; *see also* Exhibits C11; C12A.

Nineteen days later, on October 9, 2022, Officer John Masiejczyk ("Officer Masiejczyk") responded to multiple 911 calls for a shooting at the 5200 block of North Sydenham Street, around 4:06 PM. On arrival, he saw people attempting CPR on an unresponsive male lying on the [street]. The bystanders helped place the male in the patrol car, and Officer Masiejczyk drove him a few blocks away to Einstein Hospital[,] while additional police held the scene. Officer Masiejczyk called over police radio, [relaying] information about the injuries and the shooting. These events were captured on body-worn camera. After the male was removed from the police vehicle, he was identified as [Mr.] Hargett. Officer Masiejczyk found a cell phone and a projectile from a spent bullet in the rear area of the [police vehicle]. The medical staff also turned over another spent projectile from the victim's body. … Mr. Hargett was pronounced dead at the hospital. N.T., 4/22/25, at 38-57; *see also* Exhibits C17; C14.

Trial Court Opinion, 10/29/25, at 2-4 (some citations and punctuation modified; footnotes omitted).

The trial court summarized the evidence adduced regarding the ensuing investigation:

[Also on October 9, 2022], Officer Thomas Ditro ("Officer Ditro") responded to the scene via radio call just past 4:00 PM, regarding the shooting victim on the 5200 block of Sydenham Street, specifically [for Officer Ditro] to close the intersection and secure the location for the detectives. There, [Officer Ditro] saw spent FCCs (fired cartridge casings), blood on the street, firearm

- 3 -

ammunition, and a set of AirPods. Officer Ditro also reviewed a residential video from across the street that captured the incident. Per Officer Ditro, the recording depicted three black males, including the victim. One wore all-black clothing and the [second] wore a jacket with unique white lettering[. The second man] asked the [man in all-black clothing], "Why did you shoot him?" [Another officer] notified Officer Ditro the [second man had been] located and was identified as Tirus Kitchen [(Mr. Kitchen)]. [Officer Ditro interviewed] Mr. Kitchen … on body-worn camera, but [Mr. Kitchen] denied any knowledge of the incident. N.T., 4/22/25, at 58-77; *see also* Exhibits C19/D2, C20, C21, C22.

Crime Scene Unit Officer Edward Fidler ("Officer Fidler") handled the investigation of the October 9th shooting with his partner, Officer Reed. Together they marked the evidence and took photographs of the location, including ballistic items, strike markers, an [Air]Pod[s] case, and a BIC Lighter. All items recovered were placed on a property receipt for analysis of fingerprints, DNA, and/or sent to the Firearms Identification Unit for testing. N.T., 4/22/25, at 78-104; *see also* Exhibits C23A-C23X.

The parties stipulated [that] Dr. Victoria Sorokin, M.D. ("Dr. Sorokin"), Deputy Chief Medical Examiner for the City of Philadelphia, is an expert in the field of forensic pathology. Dr. Sorokin [testified that she] performed the autopsy of [Mr.] Hargett and determined the cause of death was gunshots to his torso, and the manner of death was homicide. Dr. Sorokin further indicated that, of the multiple gunshot injuries sustained, [nine] wounds specifically hit the torso. Bullets struck the following organs: the right lung (four times); the super[ior] vena cava; the liver (twice); and the small bowel. [Dr. Sorokin] determined most of these injuries would be independently lethal within a short space of time. Dr. Sorokin further opined [that], due to the absence of soot disposition or stippling on the body, the shooter was more than two to four feet from the [victim]. Also, the strike marks on the ground at the scene would indicate the [victim] was falling or already on the ground when shot. [Dr. Sorokin] confirmed the [victim's] toxicology report revealed a metabolite of PCP in the

[victim's] system[.[2]  Dr. Sorokin also testified her examination revealed] evidence of a prior gunshot wound to the [victim's] shoulder.  N.T., 4/22/25, at 105-35; *see also* Exhibit C57.

Trial Court Opinion, 10/29/25, at 4-5 (some citations and punctuation modified; original footnotes omitted; footnote added).

The trial court next detailed the evidence obtained from surveillance videos and cell phone records:

By stipulation of the parties, Detective Thorsten Lucke ("Det[ective] Lucke") was certified by as an expert in video recovery analysis and compilation.  From his investigation of the homicide and prior shooting of [Mr.] Hargett, [Detective Lucke] prepared a compilation video of both incidents.  The compilation began with footage from September 20, 2022, [depicting] the first shooting incident.  Mr. Hargett is seen riding his bicycle past [] Victor's Grocer on Duncannon Street at 8:04 AM.  The next camera angle captured the front of Appellant's home at 5206 N. Sydenham Street.  [Mr. Hargett] is depicted riding there, dismounting his bike, and walking up the steps into the [home].  Shortly thereafter, Mr. Hargett ran out of the home, while being chased by another individual who is firing a gun.  The shooter returned to the house.  The next camera angle is back at the grocery store, 22 minutes later, where … Mr. Hargett is holding his shoulder as the police car pulls up.  N.T., 4/22/25, at 137-45; *see also* Exhibit C54.

The compilation video moves to the second incident on the afternoon of October 9, 2022, and begins with the same camera angle across the street from Appellant's home [at] 5206 N. Sydenham Street, but also included footage from the grocery

_____

[2] Dr. Sorokin testified that phencyclidine (PCP) is "an animal tranquilizer that causes hallucinations in a person," and is not approved for human use.  N.T., 4/22/25, at 126-27.  On cross examination, Dr. Sorokin stated that it would be "hard to say" what effect the amount of PCP detected in Mr. Hargett's system would have had on him.  *Id.* at 132.  Dr. Sorokin explained that PCP "is a tragedious drug," which "means that the same person can be affected differently by the same dose of PCP on different days or on different administrations, and I wouldn't be able to tell specifically how it affected [Mr. Hargett.]  … [H]e could have been agitated, could have been sedated."  *Id.*

store and a street pole camera. The video ended with the residential camera recording of the shooting in front of Appellant's home. Mr. Hargett is shown interacting with the Appellant outside the residence, then collapsing next to a vehicle in the street after shots are fired. Appellant is depicted running north, and first responders arrive thereafter. N.T., 4/22/25, at 145-51; *see also* Exhibit C54.

[Detective] Lucke, also certified by stipulation as an expert in the field of cellular analysis, created a report based on the cell phone records and cell site locations for the investigation of [the two shootings]. … [Detective Lucke's] findings summarized Appellant's cell phone records, analyzing a six-month period of April 9, 2022, through October 18, 2022. … Mr. Hargett's cell phone was identified as a "hot number," [denoting] numerous calls between [Appellant and Mr. Hargett] throughout September and October[, both] before and after the first shooting, then a few days before the second shooting. The cell site tower data placed Appellant's phone by usage in the general area of the first shooting incident immediately after its occurrence on September 20, 2022. On October 9, 2022, Appellant's cell phone usage and cell site tower data placed him in the location of the homicide, leading up to and at the time of the homicide. N.T., 4/22/25, at 151-71; *see also* Exhibit C54.

The parties further stipulated that Det[ective] Lucke was an expert in the field of cellular device extraction[. Detective Lucke testified that] he conducted an extraction of Appellant's Samsung Galaxy mobile phone. … Det[ective] Lucke confirmed through numerous messages [that] Appellant was the "user" of the phone. Mr. Hargett's number was previously saved in the phone as "Code Blue," [and had been] manually deleted[, though this information was] recovered through the forensic process…. Also recovered from Appellant's phone were two separate screenshots from the Citizen's App taken on September 20, 2022, referencing the first shooting.[FN]

---

[FN] The Citizen's App is a neighborhood tracking application that monitors nearby emergencies like crimes, fires, and other public safety concerns.

---

A second set of screenshots from the Citizen's App [was] also found on the device, that were taken on October 9, 2022, at 5:04 PM and 5:41 PM[,] shortly after the homicide. Appellant received numerous text messages following the murder, the first [stating], "You good?" and another advising, "Lay low, stay put." N.T., 4/23/25, at 5-47; *see also* Exhibit C54.

Trial Court Opinion, 10/29/25, at 5-7 (some citations and punctuation modified).

The trial court also summarized the testimony of Stacy Greer (Mr. Greer), who encountered Appellant and Mr. Hargett just before the fatal shooting:

[Mr. Greer] testified he was a resident of the Logan section of Philadelphia for 45 years and knew Mr. Hargett all his life. He identified Appellant as an "acquaintance." On October 9, 2022, [Mr. Greer] initially encountered the Appellant at the convenience store a block away [from Appellant's residence,] and identified himself in the surveillance video. Upon leaving the store, Mr. Greer visited Appellant at his home to discuss a family matter. While there[, Mr. Greer] saw his friend[, Mr.] Kitchen[,] sitting outside on the steps[. Mr. Greer also testified that, upon leaving Appellant's residence, he saw Mr. Hargett arriving.] Mr. Greer confirmed he was aware of Mr. Hargett's PCP use[,] but disagreed that [Mr. Hargett] was high during the incident. N.T., 4/23/25, at 49-68; *see also* Exhibit C54.

Trial Court Opinion, 10/29/25, at 7 (some citations modified).

Pertinently, defense counsel's cross-examination of Mr. Greer included the following exchange regarding Mr. Hargett's PCP use:

[Defense counsel]: Did you know [Mr. Hargett] used PCP, sir, phencyclidine, angel dust? Were you aware of that?

[Mr. Greer]: Yes.

- 7 -

[Defense counsel]: You are. **Were you aware that he was high on PCP in this very video?**[3]

[The Commonwealth]: **Objection.**

[Mr. Greer]: **Disagree.**

THE COURT: **Sustained. The objection's sustained.**

[Defense counsel]: You were aware he used PCP, correct?

[Mr. Greer]: I assumed he has.

[Defense counsel]: You assume. First, you said you were aware, now, you're assuming?

[Mr. Greer]: Yeah.

[Defense counsel]: No further questions, Your Honor.

N.T., 4/23/25, at 66-67 (emphasis and footnote added).

The trial court detailed further evidence regarding the October 9, 2022, shooting, as follows:

> Homicide Unit Detective John Maha ("Det[ective] Maha") investigated the shooting of Mr. Hargett by canvassing the area of the incident, recovering video, and speaking with witnesses. He spoke with [Mr.] Greer[,] who provided a formal statement, but [Mr.] Kitchen declined to be interviewed. Det[ective] Maha obtained search warrants for Appellant's call detail records and his residence at 5206 N. Sydenham Street. At the [residence], police retrieved multiple live rounds of .9-millimeter ammunition and four fired .9-millimeter FCCs. [Detective Maha testified that a] warrant was … secured for Appellant's arrest on November 16, 2022, after which [Appellant] was taken into custody and interviewed on video. A ghost gun polymer-80 … recovered [from] Appellant during his arrest did not match the ballistics from the homicide. [Detective Maha indicated t]he firearm that was used

---

[3] Defense counsel referred to the video depicting the October 9, 2022, shooting, as well as Mr. Greer's encounter with Mr. Hargett outside Appellant's residence just before the shooting. **See** N.T., 4/23/25, at 65-67; **see also** Exhibit C54.

in [Mr. Hargett's] murder was found six months later in a vehicle related to a separate shooting investigation. N.T., 4/23/25, at 69-84; ***see also*** Exhibit C36, C47.

Via stipulation, the parties submitted evidence that the DNA analysis of the [Air]Pods found at the homicide scene [was] a major component match to [] Appellant, and the male source of DNA on the BIC lighter [was] also a major component DNA match to Appellant. Additionally, the parties stipulated to Appellant's non-licensure to carry a firearm. N.T., 4/23/25, at 85-89; ***see also*** Exhibit C60, C61, C70.

Trial Court Opinion, 10/29/25, at 7-8 (some citations modified).

Testifying in his own defense, Appellant maintained he acted in self-defense with respect to both shootings. The trial court summarized Appellant's testimony regarding the September 20, 2022, shooting as follows:

Appellant … confirmed 5206 N. Sydenham Street was his residence. He stated he had a business relationship with [Mr.] Hargett, as he sold weed for [Mr. Hargett] for a couple of months. Mr. Hargett contacted him by phone numerous times to collect money owed[,] and Appellant said he did [not] respond. Appellant indicated that Mr. Hargett entered his home on September 20, 2022, without permission, high on PCP[,] and threatened him with a firearm about the debt. Appellant agreed to remit payment by the end of the week, but when Mr. Hargett turned to leave, Appellant pulled his own gun. Mr. Hargett ran from the home and Appellant shot him twice outside. [N.T., 4/23/25,] at 95-104.

Trial Court Opinion, 10/29/25, at 8.

Pertinently, Appellant testified as follows regarding Mr. Hargett's PCP use:

[Defense counsel]: Did [Mr. Hargett] use drugs?

[Appellant]: Yes, he did.

[Defense counsel]: What kind of drugs did—

[Appellant]: PCP.

[Defense counsel]: Did you know other people in your family that used PCP?

[Appellant]: Yes, my mother.

[Defense counsel]: Your mother. Did you see, growing up, the effect PCP had on her?

[Appellant]: Yes, I did.

[Defense counsel]: Are you very familiar with the effects of PCP?

[Appellant]: Yes, I am.

[Defense counsel]: … [D]id you see [Mr. Hargett] often high on PCP?

[Appellant]: Yes, I did.

[Defense counsel]: The gentleman who testified earlier here today, [Mr. Greer,] you saw him?

[Appellant]: Yes.

[Defense counsel]: His … niece and you have a baby together?

[Appellant]: Yes.

[Defense counsel]: Did that gentleman use PCP?

[Appellant]: Yes, he does.

[Defense counsel]: Did that gentleman use PCP in your presence?

[Appellant]: Yes, they have.

…

[Defense counsel]: And is [Mr. Greer] basically part of [Mr. Hargett's] family?

[Appellant]: Yes.

[Defense counsel]: Okay. **Now, when [Mr. Hargett] was on PCP, what kind of behavior did he exhibit toward you and others?**

- 10 -

[Appellant]: **He was very aggressive**.

[The Commonwealth]: **Objection**.

THE COURT: One moment; **sustained**.

N.T., 4/23/25, at 98-100 (emphasis added).

Regarding the September 20, 2022, shooting, the following exchange

occurred:

[Defense counsel]: Was [Mr. Hargett] high on PCP, to the best of your knowledge?

[The Commonwealth]: Objection.[4]

[Defense counsel]: How was [Mr. Hargett's] behavior towards you at—

[Appellant]: He was real aggressive, because I owed him money.

[Defense counsel]: Was he acting in a way that you recognized?

[Appellant]: Yes.

[Defense counsel]: What kind of way was he acting?

[Appellant]: Like he was real loud, and he was shouting and pointed a gun at me.

*Id.* at 100-01 (footnote added).

The trial court summarized Appellant's testimony regarding the fatal

shooting:

Appellant testified that on October 9, 2022, he exited his home to find Mr. Hargett outside[,] talking to [Mr.] Kitchen. As [Appellant and Mr. Hargett] began to argue about the debt, Mr. Hargett ascended the front steps, grabbed Appellant by the shirt, placed

_____

[4] The trial transcript indicates the trial court did not rule on this objection. Rather, defense counsel immediately proceeded to ask a different question. *See* N.T., 4/23/25, at 100-01.

a gun at [Appellant's] chest and stated[,] "Have my money by the end of the week, or I'm going to snatch your life young boy." Appellant indicated he grabbed the gun from [Mr. Hargett], pulled the trigger "two or three times," and Mr. Hargett ran.[5] Appellant's testimony was conflicting as to whether he shot Mr. Hargett from the steps, by the vehicle, near the street, or at close range. None of this testimony was consistent with the video, ballistics evidence[,] or the medical examiner's report. *See* N.T., 4/23/25, at 95-138. [Appellant] also presented four relatives [who testified] as character witnesses on [his] behalf…. *See id.* at 138-50.

Trial Court Opinion, 10/29/25, at 8-9 (some citations modified; footnote added).

At the trial's conclusion, the jury convicted Appellant of the above offenses. On April 24, 2025, the trial court imposed an aggregate sentence of life imprisonment at CP-51-CR-1019-2023 (relating to the October 9, 2022, murder), and a concurrent, aggregate sentence of 4 to 8 years' imprisonment at CP-51-CR-1018-2023 (relating to the September 20, 2022, shooting). Appellant filed timely post-sentence motions, which were denied by operation of law on August 25, 2025.

_____

[5] Appellant testified he was "scared for [his] life," and did not intend to kill Mr. Hargett. N.T., 4/23/25, at 106. On cross-examination, when asked why he continued to shoot Mr. Hargett in the back multiple times after Mr. Hargett had fallen down, Appellant testified the gun "was out of control" and "just kept firing." *Id.* at 126, 132. Appellant also testified he fled the scene because he "was on probation" and "wasn't supposed to have a gun." *Id.* at 105. Additionally, Appellant confirmed that, when police asked him about the shootings, he did not tell them he acted in self-defense. *Id.* at 134. Rather, Appellant agreed that, apart from telling his family, he claimed self-defense for the first time in his trial testimony. *Id.*

Appellant timely appealed at both dockets.[6]  Appellant and the trial court have complied with Pa.R.A.P. 1925.  Appellant presents the following question for our review:

> Where Appellant claimed self-defense, did the trial court err, abuse its discretion and violate Appellant's right to present his defense, secured by due process of law, when it sustained the prosecutor's objections to the defense's elicitation that the victim appeared high on PCP on the video of the incident, and Appellant's experience in witnessing [the victim's] typical aggressive behavior while he was high on PCP?

Appellant's Brief at 2.

Appellant argues the trial court erred and abused its discretion in sustaining objections to (1) defense counsel questioning whether Mr. Greer was "aware that [Mr. Hargett] was high on PCP" at the time of the October 9, 2022, shooting; and (2) defense counsel asking Appellant "what kind of behavior" Mr. Hargett exhibited "when he was high on PCP[.]"  *Id.* at 7-8 (quoting N.T., 4/23/25, at 66, 99); *see also id.* at 10-16.  Appellant maintains "[t]he precluded testimony was relevant to show that the 'victim' was the aggressor and to demonstrate that Appellant was in fear of imminent harm."  *Id.* at 10-11 (citing, *inter alia*, **Commonwealth v. Amos**, 284 A.2d 748, 750-51 (Pa. 1971) (recognizing that, in self-defense cases, "evidence that the victim was a man of quarrelsome disposition [is] admissible to show that the defendant believed himself to be in danger"; and "evidence of the [victim's]

_____

[6] This Court consolidated the appeals *sua sponte*.

- 13 -

propensity for hostility, vindictiveness and violence [is] admissible on the issue of whether or not the victim was the aggressor")).  Appellant argues the precluded testimony was especially critical in light of Dr. Sorokin's testimony that PCP can have different effects on different people.  *Id.* at 11-12.

Appellant disputes the trial court's conclusion that the challenged evidentiary rulings did not prejudice Appellant and/or constituted harmless error.  *Id.* at 14-16 (citing Trial Court Opinion, 10/29/25, at 12-14).  Appellant argues the challenged evidentiary rulings "violated Appellant's right to present a defense, secured by the Due Process Clause of the Fourteenth Amendment." *Id.* at 13-14 (citing, *inter alia*, **Commonwealth v. Ward**, 605 A.2d 796, 797 (Pa. 1992) ("An accused has a fundamental right to present evidence so long as the evidence is relevant and not excluded by an established evidentiary rule.")).  Appellant contends the evidentiary rulings impaired "two prongs of [his] claim of self-defense, *i.e.*, that the 'victim' was the aggressor and that Appellant had a sound basis for fearing imminent harm…." *Id.* at 14.

The Commonwealth counters that, while the precluded testimony "might have had some theoretical relevance to a claim of self-defense," the precluded testimony was cumulative of other, admitted evidence of Mr. Hargett's PCP use and aggressive behavior.  Commonwealth Brief at 13; *see also id.* at 13-15.  The Commonwealth points to the toxicology report establishing that Mr. Hargett "had PCP in his blood at the time of his death," the testimony from Mr. Greer and Appellant that Mr. Hargett was a PCP user, and Appellant's

testimony regarding Mr. Hargett's aggressive behavior during both shooting incidents. *Id.* at 14-16.

The Commonwealth further argues that Appellant suffered no prejudice from the challenged evidentiary rulings. *Id.* at 14. The Commonwealth notes that, though the trial court sustained the prosecutor's objection, Mr. Greer nevertheless responded that he disagreed with defense counsel's contention that Mr. Hargett was high on PCP at the time of the fatal shooting. *Id.* The Commonwealth therefore maintains that the exclusion of Mr. Greer's testimony on this point actually benefitted Appellant. *Id.*

The Commonwealth emphasizes Appellant's testimony that Mr. Hargett "was real aggressive, *because I owed him money*." *Id.* at 14 (quoting N.T., 4/23/25, at 101 (Commonwealth's emphasis)). The Commonwealth argues Appellant's testimony suggests he believed "that an outstanding drug debt," rather than the victim's PCP use, "was actually the primary motivating factor behind the victim's alleged aggressive behavior." *Id.* at 15. The Commonwealth asserts Appellant's precluded testimony (that the victim typically exhibited aggressive behavior when high on PCP) was "at most of highly tangential relevance[.]" *Id.*

Finally, the Commonwealth argues that, even if the challenged evidentiary rulings were erroneous, the errors "would clearly have been harmless[,] as both rulings were insignificant by comparison with the overwhelming evidence of [Appellant's] guilt." *Id.* at 16. The Commonwealth

maintains that video evidence of both shootings depicted Appellant firing multiple gunshots at the victim while the victim was attempting to flee. *Id.* at 17. The Commonwealth highlights Dr. Sorokin's testimony "that the victim suffered nine gunshot wounds during the fatal shooting, the majority of which entered the victim's body from the back as he was falling or already on the ground." *Id.* at 17-18. The Commonwealth further asserts that Appellant's decision to flee the murder scene evinced "consciousness of guilt" and "rebutt[ed] his self-defense claim." *Id.* at 18. The Commonwealth argues that "[w]here, as here, there is 'overwhelming evidence of an intentional killing and [a] lack of support [in the] record for [a defendant's] theories of self-defense,' there is no reasonable probability that a minor evidentiary ruling impacted the verdict…." *Id.* (quoting *Commonwealth v. Thornton*, 431 A.2d 248, 252 (Pa. 1981)).

"Questions concerning the admissibility of evidence are within the sound discretion of the trial court and we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion." *Commonwealth v. Focht*, 334 A.3d 931, 939 (Pa. Super. 2025) (citation omitted). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Loughran*, 348 A.3d 1186, 1196 (Pa. Super. 2025).

"To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." ***Commonwealth v. Yockey***, 158 A.3d 1246, 1254 (Pa. Super. 2017) (citation omitted). "[A]n erroneous ruling by a trial court on an evidentiary issue does not require us to grant relief where the error was harmless." ***Id.*** (quoting ***Commonwealth v. Chmiel***, 889 A.2d 501, 521 (Pa. 2005)); ***see also Commonwealth v. Rivera***, 296 A.3d 1141, 1161 n.20 (Pa. 2023) ("The harmless error rule derives from the notion that although an accused is entitled to a fair trial, he is not entitled to a perfect one. The harmless error rule can save the time, effort, and expense of unnecessary retrials where the defendant has not been prejudiced by an error." (quoting ***Commonwealth v. Story***, 383 A.2d 155, 164 (Pa. 1978))).

As our Supreme Court has explained, the

> legal standards governing harmless error are well[ ]settled. An error warrants relief only if the appellate court is convinced beyond a reasonable doubt that the error is harmless. An error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a reasonable possibility that an error might have contributed to the conviction, the error is not harmless. The Commonwealth bears the burden of proving that the error was harmless beyond a reasonable doubt.
>
> Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted [or excluded] evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted [or excluded] evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so

- 17 -

insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Fitzpatrick***, 255 A.3d 452, 483 (Pa. 2021) (internal citations, quotation marks, and original brackets omitted; bracketed language added).

Instantly, in its Rule 1925(a) opinion, the trial court determined that Appellant suffered no prejudice resulting from the sustained objections, and any error arising from the challenged evidentiary rulings was harmless. ***See*** Trial Court Opinion, 10/29/25, at 12-15. The trial court observed that, in connection with both rulings, the witnesses in fact answered defense counsel's questions within the jury's hearing. ***Id.*** at 13-14 (quoting N.T., 4/23/25, at 66-67 (Mr. Greer responding, "Disagree," to defense counsel's question whether Mr. Greer was aware Mr. Hargett was high on PCP at the time of the fatal shooting), 99-100 (Appellant responding, "He was very aggressive," to defense counsel's question "what kind of behavior did [Mr. Hargett] exhibit" when high on PCP)). The trial court opined that, the sustained objections notwithstanding, the jury was nevertheless "made aware" of the witness's answers, and those answers were "in essence ***admitted*** for [the jury's] consideration." ***Id.*** at 14 (emphasis in original). The trial court concluded Appellant suffered no prejudice because the witnesses' "testimony was not withheld from the jury." ***Id.***

The trial court further determined that any error was harmless because

the Commonwealth presented overwhelming evidence of Appellant's guilt, including: (1) video compilations of both shootings; (2) eyewitness testimony; (3) DNA analysis; (4) cellphone and cell [s]ite tower information; (5) ballistic reports; and (6) the medical examiner's determination.

*Id.* at 15. The trial court therefore concluded that "any error was harmless beyond a reasonable doubt and Appellant is not entitled to relief…." *Id.*

Assuming *arguendo* that the challenged evidentiary rulings were erroneous,[7] we agree with the trial court that the errors were harmless. Our review confirms Appellant suffered no prejudice as a result of the rulings, in part because, despite the sustained objections, the jury heard the witnesses' answers to defense counsel's questions.[8] *See* N.T., 4/23/25, at 66-67, 99-100.

_____

[7] The trial court's opinion does not explain the reasons underlying the challenged evidentiary rulings. *See generally* Trial Court Opinion, 10/29/25. Its opinion sets forth a harmless error analysis only, and it is unclear whether the trial court concedes that the rulings were erroneous. *See id.* at 12-15. The trial transcript discloses neither the Commonwealth's grounds for objecting nor the trial court's reasons for sustaining the objections. *See* N.T., 4/23/25, at 66-67, 99-100. Under these circumstances, and in light of our harmless error analysis, we need not address whether the rulings were proper.

[8] Appellant argues that "when an objection is sustained, the answer is not evidence[.]" Appellant's Brief at 15. Appellant relies on Pennsylvania Suggested Standard Criminal Jury Instruction § 2.09(4), which states as follows:

Part of my job is to rule on any objection to evidence made by counsel. If I decide the evidence is admissible, I will overrule the objection. This simply means that you are entitled to hear and consider the evidence. On the other hand, if I decide the evidence is inadmissible, I will sustain the objection. **This means that you**

*(Footnote Continued Next Page)*

Our review further discloses that Mr. Greer's belief as to whether Mr. Hargett was high on PCP at the time of the fatal shooting was cumulative of other evidence, *i.e.*, Dr. Sorokin's testimony that the toxicology report confirmed Mr. Hargett indeed had PCP in his system. *See* N.T., 4/23/25, at 66-67; N.T., 4/22/25, at 126-27, 131-32, 134-35; Exhibit C57. Additionally, Appellant's statement that Mr. Hargett exhibited aggressive behavior when high on PCP was substantially similar to Appellant's extensive testimony that Mr. Hargett behaved aggressively and threatened Appellant with a gun during both shooting incidents. *See* N.T., 4/23/25, at 99-136.

Finally, we agree with the trial court that the Commonwealth presented overwhelming evidence that the shootings were not justified by self-defense— particularly, uncontradicted evidence that, in both shootings, Appellant fired multiple gunshots at Mr. Hargett *after* Mr. Hargett was fleeing and/or falling to the ground. *See* Exhibit C54 (video compilation); N.T., 4/22/25, at 112-24 (Dr. Sorokin's testimony that Mr. Hargett had multiple bullet entrance

---

**are not entitled to hear the evidence.** Sometimes I may order evidence stricken from the record after you hear it. **Whenever I sustain an objection or order evidence stricken from the record, you must completely disregard that evidence when deciding the case.**

*Id.* at 15 (quoting Pa. SSJI (Crim), § 2.09(4) (2024) (Appellant's emphasis)). However, Appellant concedes that, in the instant case, the trial court **did not** give this jury instruction. *See id.* Further, our review of the trial transcript confirms that, with respect to both challenged evidentiary rulings, the trial court neither struck the witnesses' answers from the record nor instructed the jury to disregard them. *See* N.T., 4/23/25, at 66-67, 99-100.

wounds on his back, inflicted while Mr. Hargett was either falling forward or laying on the ground); N.T., 4/23/25, at 117-18, 126-27, 132-33, 135-36 (Appellant's admissions that he shot at Mr. Hargett while Mr. Hargett was running away and/or falling to the ground).

As each of the foregoing grounds independently renders harmless any error arising from the sustained objections, we conclude the challenged evidentiary rulings do not constitute reversible error. *See Yockey*, 158 A.3d at 1254. Our review confirms that the rulings could not have contributed to the verdict, and the Commonwealth has met its burden of proving that any errors were harmless beyond a reasonable doubt. *See Fitzpatrick*, 255 A.3d at 483. Therefore, Appellant's sole issue merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/13/2026